367 P.2d 545

Frank MARTINEZ, Claimant,
Plaintiff-Appellee,

v.

**WESTER BROTHERS WHOLESALE
PRODUCE COMPANY, Employer,
Defendant-Appellant.**

No. 6834.

Supreme Court of New Mexico.

Dec. 28, 1961.

H. E. Blattman, Roberto L. Armijo, Las Vegas, for appellant.

Donald A. Martinez, Las Vegas, for appellee.

CHAVEZ, Justice.

This is a workman's compensation case brought here on appeal by Wester Brothers, Inc., to review a judgment for appellee entered pursuant to a jury verdict.

Appellee filed his claim on February 24, 1959, seeking compensation for injuries sustained by appellee on February 12, 1959, while employed by appellant as a delivery truck driver in appellant's produce plant in Las Vegas, New Mexico. Claim was for permanent and total disability. Appellee's claim alleged that appellant refused to pay any compensation, and refused to pay any hospital and medical expenses incurred by appellee. Appellant's answer admitted that appellee was employed by appellant on February 12, 1959; that appellee was doing the work described, and that appellee's average weekly earnings were approximately $52. Appellant denied liability and denied each and every material and affirmative allega-

tion of the claim, not specifically admitted. Appellant, by way of affirmative defense, alleged that appellee's claim was prematurely filed in that the injury was suffered on February 12, 1959, and the claim was filed on February 24, 1959.

Appellant, at the commencement of the trial, moved that the claim be dismissed as being prematurely filed. The motion was overruled. After the jury verdict, and before entry of judgment, appellant filed a motion for judgment for appellant notwithstanding the verdict, which was also overruled.

On February 10, 1960, the jury returned a verdict for appellee, finding him permanently, partially disabled to the extent of 75%, and the trial court entered judgment that appellant pay appellee compensation at the rate of $22.50 per week for a period of 550 weeks, commencing February 12, 1959.

Appellee was a truck driver delivering produce to appellant's customers in Las Vegas. On February 12, 1959, while setting up an order, he tried to get down the top crate of cabbages, the top crate slipped and the crates fell, pushing appellee down causing injury to his back. Appellee testified that the crates were about head high and weighed 125 to 130 pounds. Although in pain, appellee continued working until 4:00 p. m. when he told a fellow employee that he thought he had strained his back. The fellow employee suggested that he should tell Mr. Paul Bow, the bookkeeper for appellant. Appellee told Paul Bow, who advised appellee to go to a doctor and "Tomorrow you come back so we can make a report of injury."

That evening appellee saw Dr. Junius A. Evans and the next day he again saw Paul Bow who wrote out a report of injury. About five days later appellee went to see Mr. John Wester, president of appellant corporation. Appellee testified:

"Q. And then about five days afterwards when you had a conversation with him, what was the effect of it? A. Oh, I told him—he called Dr. Evans and he told him that I was pulling his leg, that I hadn't gotten hurt there, so that's the time I went to see him. I told him I was injured, and he says, 'You look good. You could be over there sacking potatoes.' And I told him, 'my back hurts too much.' And he says, 'All these doctors want is your money.' And I just walked out.

"Q. Did you ask him about paying you compensation? A. Yes.

"Q. And what did he say? A. He said no.

"Q. That he would not pay you any compensation? A. Yes."

On cross-examination, appellee testified:

"Q. Now, you made the statement that you went to see John Wester concerning compensation? A. Yes, I did.

"Q. Isn't it true that you went to see Mr. Wester and asked him to give you additional pay checks? In other words, you wanted to get some more money, as much as you had already been receiving up to that time? In other words, you had been working for him a little over a month, and you wanted to continue to draw your pay checks? A. Did I tell him to give me—

"Q. (Interrupting): Your pay checks. In other words, you wanted to continue drawing your pay checks. A. The same pay checks, no.

"Q. How much did you ask him for? A. I didn't ask him.

"Q. You didn't ask him? A. No, I didn't put him any amount.

"Q. You didn't ask him at all? A. I asked him was he going to give me compensation and to pay my bills. He said no.

"Q. What bills did you have up to that time? A. Dr. Evans."

Appellant, John Wester, testified:

"Q. And state whether or not you had a conversation with Mr. Paul Bow concerning Frank Martinez early the morning of the 13th? A. On the morning of the 13th, I was out at approximately seven o'clock or shortly before and Mr. Bow came to work later and told me of the alleged accident; and I went back to the refrigerator boxes and checked the boxes.

"Q. Did Mr. Bow report to you what had been told him concerning this injury that Mr. Martinez had reported to Mr. Bow? A. To the best of my knowledge, he told me that he had been injured while loading a crate of cabbage. He said that the crate had fallen on him.

\*      \*      \*      \*      \*      \*

"Q. What made you suspicious that a crate of cabbage had fallen on Mr. Martinez? A. It would almost be required for a person to have laid down for a crate of cabbage to fall and land on him no higher than they were stacked.

\*      \*      \*      \*      \*      \*

"Q. Did you then receive a report later on that Mr. Martinez had gone to see Dr. Evans? A. After making the observations that I had made, I contacted Dr. Evans because of the fact that in Mr. Martinez' report to Mr.

Bow, Martinez stated that he had seen Dr. Evans. So I called Dr. Evans to see to what extent an injury he was claiming. And at that time was the time that Dr. Evans made the statement that he made here awhile ago, the fact it was none of my business who he doctored. However, I asked him prior to that if—who he was looking to for payment for his services, and he told me naturally it would be Wester Brothers. Then I asked him why he had not informed me of any findings that he had had, or the fact that he intended to doctor him and charge me with it; and that was the time when he told me it was none of my business who he doctored.

\*   \*   \*   \*   \*   \*

"Q. Now, when did you see Frank Martinez after this? A. This was on a week end that he was—Friday, when he was supposed to have been injured. It was about Tuesday he came into the garage down on Third Street where we do our maintenance work on our trucks. And he came in in a very relaxed manner and asked me what my intentions were as far as he was concerned.

"Q. Concerning what? A. At first, I assumed he meant his employment; and I asked him if there was something else that he might be doing. We have various jobs, such as you have ripe tomatoes, green tomatoes, and such that are mixed in, and it involves sorting them, that a crippled person could do with no trouble at all. And I felt obligated if there was work—I needed the man—there was work to be done. If he could do it, fine.

"Q. Were you planning to continue Mr. Martinez in his employment then? A. Yes.

"Q. Go ahead. A. And when I asked him that, asked him what his intentions were, told him I had other jobs he might could do, he said, 'Oh, no. Dr. Evans told me I couldn't do anything.' He told me he couldn't do any work at all. Then he asked me what I was going to do in regard to compensation."

On cross-examination Mr. Wester testified:

"Q. And your insurance had lapsed at this time? A. The insurance had been dropped.

"Q. And actually that is why you have refused to pay this boy, isn't it? A. If the insurance company had had the coverage, they would have paid him, not me. My refusal to pay him was based on the fact that he entered the garage as I stated a little bit ago, in an upright condition and very flexible con-

dition, to state his troubles. I have a bad disc in my back. I never made a recovery from that complete. And the fact that he could walk upright in a couple of days after an accident, or three or four days afterwards—it never stopped me from doing my work but I certainly didn't walk upright.

"Q. Then your refusal to pay him was based on your opinion as to whether he was injured or not, and not on the Doctor's opinion? A. The time that I refused to pay him was when he informed me the Doctor had instructed him to do no work. He didn't ask of what class. He didn't ask how heavy the work might be, or what the work might be, or whether it would bother his back at all, or not. He merely informed me the Doctor had instructed him to do nothing.

\*   \*   \*   \*   \*   \*

"Q. And then when he told you the doctor told him not to do any kind of work, then you refused to pay? A. That's right.

"Q. And your refusal to pay was based on the fact the doctor had told him not to do any work? A. My refusal to pay him was based on the fact I was very suspicious of the fact at first, and I was quite sure he was putting on a show in order to collect for back injury, which is done a thousand times over.

"Q. And you still think he is putting on a show? A. I do.

\*   \*   \*   \*   \*   \*

"Q. Now, your only reason for refusing to pay this man was, one, that you didn't have insurance, and two, that he didn't want to go and do these light jobs? A. The reason I refused to pay him was that he was not working and therefore not entitled to receive pay.

\*   \*   \*   \*   \*   \*

"Q. Now, you did tell Dr. Evans you would not be responsible for his charges, did you not? A. What I asked Dr. Evans was the condition that he found and he told me that he was in great pain. And I said, 'if he was in great pain, why was it that you didn't contact me and tell me you were going to doctor him as long as you anticipated charging me for it?' He says, 'I will doctor who I please and it is none of your business.' And I says, 'Then you figure the same way about collecting your pay.' because I felt if it was none of my business about him doctoring, it should be my business about me paying as long as I was the one that was monitarily obligated.

"Q. And your intention by that statement was to advise him you would not

pay his bills or stand responsible for his bill? A. I think he gathered that.

"Q. Was that your intention? A. It was certainly my intention when he told me it was none of my business who he doctored.

\*  \*  \*  \*  \*  \*

"(Whereupon, the Court Reporter read the following question: 'Q. And from the time that Frank Martinez asked you what your intentions were about his compensation, and you asked him to do these light jobs of sacking potatoes or whatever it was, and he told you that the Doctor had told him not to do any kind of work, it was your intention then not to pay him any compensation whatsoever?')

"The Court: If your answer is yes or no, then you have the right to explain the reason why your answer has been either yes or no.

"The Witness: Well, the answer is yes, just like it was the last time he asked me, Judge.

"The Court: But that doesn't answer the question. Read the question again.

"(Whereupon, the Court Reporter again read the question.)

"A. My intentions were to pay him nothing unless he worked for it."

The sole question for decision is whether the claim was prematurely filed. The controlling statutory provisions are: Section 59–10–13, N.M.S.A.1953 Comp., which provides:

"The compensation herein provided shall be paid by the employer to any injured workman entitled thereto in semi-monthly instalments as nearly equal as possible excepting the first instalment which shall be paid not later than thirty-one (31) days after the date of such injury. \* \* \* In event such employer shall fail or refuse to pay the compensation herein provided to such workman \* \* \* it shall be the duty of such workman, insisting upon the payment thereof, to file a claim therefor in the manner and within the time hereinafter provided. \* \* \* In event of the failure or refusal of any employer to pay any workman entitled thereto any instalment of the compensation to which such workman may be entitled under the terms hereof, such workman shall be entitled to enforce the payment thereof by filing in the office of the clerk of the district court a claim \* \* \* and filed not later than one (1) year after such refusal or failure of the employer so to pay the same. \* \* \* "

Section 59–10–18, N.M.S.A.1953 Comp., provides:

"No compensation shall be due or payable under this act (§§ 57–901—57–931 [59–10–1 to 59–10–31]) for any injury which does not result in either the temporary disability of the workman lasting for more than seven (7) days or in his permanent disability or permanent injury, as herein described, or death; Provided, however, that if the period of temporary disability of the workman shall last for more than four (4) weeks from the date of the injury, then compensation under this act (§§ 57–901—57–931 [59–10–1 to 59–10–31]) shall be payable in addition to the amounts hereinafter stated in a like amount for the first seven (7) days after date of injury.

"But for any such injury for which compensation is payable under this act (§§ 57–901—57–931 [59–10–1 to 59–10–31]), the employer shall in all proper cases, as herein provided, pay to the injured workman or to some person authorized by the court to receive the same, for the use and benefit of the beneficiaries entitled thereto, compensation at regular intervals or no more than sixteen (16) days apart, in accordance with the following schedule, less proper deduction on account of default in failure to give notice of such injury as required in section 57–913 [59–10–13] hereof;"

Section 59–10–19, N.M.S.A.1953 Comp., provides:

"No compensation shall be allowed for the first seven (7) days after injury is received except where such injury results in disability of the workman for more than four (4) weeks, then compensation shall be allowed from the date said injury occurred; but in no case shall compensation be allowed unless the employer has actual knowledge of the injury or is notified thereof within the period specified in section 57–913 [59–10–13] hereof:

"After injury, and continuing so long as medical or surgical attention is reasonably necessary, the employer shall furnish all reasonable surgical, medical, osteopathic, chiropractic and hospital services and medicine, not to exceed the sum of seven hundred dollars ($700.00), unless the workman refuses to allow them to be furnished by the employer, * * *.

*     *     *     *     *     *

"Compensation for all classes of injuries shall run as follows:

"Surgical, medical and hospital services and medicines, as provided in this section. After the first seven (7) days, compensation during temporary disability lasting less than four (4) weeks from date of injury and provided that

after four (4) weeks from date of injury if the workman continues ;to be temporarily disabled, then also for the first seven (7) days, until the injury has healed, and thereafter compensation as provided in this act (§§ 57- ·901—57-931 [59–10–1 to 59–10–31]) as amended according to the condition of permanent total or permanent partial disability the workman has suffered as a result of the injury."

Appellant relies upon Fresquez v. Farnsworth & Chambers Co., 60 N.M. 384, 291 P.2d 1102; Spieker v. Skelly Oil Co., 58 N.M. 674, 274 P.2d 625; State ex rel. Mountain States Mut. Cas. Co. v. Swope, 58 N.M. 553, 273 P.2d 750; and George v. Miller & Smith, 54 N.M. 210, 219 P.2d 285. Appellant contends that the claimant cannot file suit until thirty-one days after the day of the injury; and that on February 24, 1952, no payment was due and appellant was not in default in any respect.

Appellee concedes that the cases cited by appellant stand for the proposition that an injured workman cannot file his claim for benefits until there has been a failure or refusal on the part of the employer to pay to the injured workman some instalment of compensation that has become due to him. Appellee further concedes that there can ordinarily be no failure to pay any compensation until the first one becomes due, which is thirty-one days after the injury becomes compensable. However, appellee argues that appellant's refusal to furnish appellee's hospital and medical services and appellant's statement about five days after the injury, that he would not pay compensation, distinguishes this case from the cases cited by appellant.

In Fresquez v. Farnsworth & Chambers Co., supra [60 N.M. 384, 291 P.2d 1103], this court said:

"Whether the suit was premature depends upon the existence or not of default on defendant's part in the payment, seasonably, to plaintiff of the installments provided by law. If there had been a failure or refusal to pay the same, punctually, then suit was timely and the question of error in the method chosen by the court for payment of a portion of the attorneys fees allowed must be determined. If there was no failure or refusal in the behalf indicated then there was no default. In that event, the suit is premature and, of course, no compensation * * *."

We have already set out that the injury occurred on February 12, 1959, and suit was filed on February 24, 1959. The conversation between appellee and John Wester, the president of appellant's company, wherein Wester denied liability and told appellee that he would not pay compensation or hospital and medical benefits, occurred about five days after the injury.

It seems to us that on February 24, 1959, the date that the claim was filed, appellant had not failed or refused to pay the compensation provided by law, because the first instalment payment was not due until thirty-one days after February 12, 1959, the date of the injury. On the date that the claim was filed there was no duty on the part of the employer to make the first instalment payment, and there could be no refusal or failure to pay until such time as that duty fell upon the employer. Spieker v. Skelly Oil Co., supra.

In State v. Swope, supra, we held that where there was no payment due and payable to the worker, threats made by an unscrupulous adjuster for the insurance company that payments would be discontinued unless the worker would settle for $3,000, were not equivalent to a failure or refusal to pay compensation payments when due.

In George v. Miller & Smith, supra [54 N.M. 210, 219 P.2d 286], this court, speaking through Justice Lujan, said:

"Thus it will be seen that in order to confer jurisdiction in the district courts, the employer must have either failed or refused to make compensation payments to the injured workman as provided in the Act before he is entitled to file a claim. * * *"

As to instalment compensation payments, we hold that the claim filed by appellee was prematurely filed.

We now consider appellee's contention relative to surgical, medical and hospital services. The employer, appellant here, had notice of the injury the morning after it happened. A report of injury was written out the day after the accident by Paul Bow, appellant's bookkeeper.

The record discloses that appellee received medical services from the evening of February 12, 1959, the date of the injury, up to the time of trial approximately a year later. He incurred medical expenses for services rendered by Dr. Junius A. Evans of Las Vegas, by Dr. L. M. Overton, an orthopedic physician in Albuquerque, and by Ruth A. Bauer, a physical therapist. He also incurred hospital expenses in the Las Vegas Hospital.

It is noted that as to instalment compensation payments, the statute provides that they shall be made semi-monthly, except that the first instalment shall be paid not later than thirty-one days after the date of the injury. As to medical and hospital benefits, which the injured workman is entitled to under the Act, there is no limitation except that after injury and continuing so long as medical or surgical attention is reasonably necessary, the employer shall furnish all reasonable medical, surgical and hospital services, and medicine,

not exceeding $700. See Nasci v. Frank Paxton Lumber Co., (No. 7050, decided today), 69 N.M. 412, 367 P.2d 913.

We call attention to the fact that the judgment rendered by the district court omitted any mention of surgical, medical or hospital expenses, no doubt on the basis that the principal contention was the amount of compensation. However, the claimant, having sought medical, surgical and hospital expenses in his claim, should not be prohibited from recovering such expenses because of the failure to mention the same in the judgment.

The cause is reversed with direction to the district court to dismiss that part of the claim which relates to instalment compensation payments and to proceed in a manner not inconsistent with the view herein expressed as to medical, surgical and hospital expenses.

It is so ordered.

COMPTON, C. J., and CARMODY, J., concur.

MOISE and NOBLE, JJ., not participating.